# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

THOMAS P. HARWOOD III,

       *Plaintiff*,

v.

AMERICAN AIRLINES, INC.,

       *Defendant*.

Case No. 1:17-cv-00484-LO-JFA

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Adam Augustine Carter
R. Scott Oswald
The Employment Law Group, P.C.
888 17th St. NW, 9th floor
Washington, D.C. 20006
(202) 261-2803
(202) 261-2835(facsimile)
acarter@employmentlawgroup.com
soswald@employmentlawgroup.com
*Counsel for Plaintiff*

**Table of Exhibits**

| Exhibit No. | Description | Bates Numbers (if any) |
|---|---|---|
| 1. | Deposition of Scott Hansen (30(b)(6)) | |
| 2. | Deposition of Jerry Shaw | |
| 3. | American Airlines Personal Leave of Absence Policy | D000032-33 |
| 4. | Deposition of Sue Kalosa (30(b)(6)) | |
| 5. | Deposition of Thomas P. Harwood, III | |
| 6. | Declaration of Thomas P. Harwood, III | |
| 7. | Hiring Letter for Thomas P. Harwood, III | D000923 |
| 8. | Discharge Order for Major General Thomas P. Harwood, III | D000802-03 |
| 9. | June 2015 Emails | D000790-92 |
| 10. | June and July 2015 Emails | D000793-97 |
| 11. | August 10, 2015 Email | Harwood0001050-52 |
| 12. | August 5-7, 2015 Emails | Harwood0001060-62 |
| 13. | August 20-21, 2015 Emails | Harwood0001018-21 |
| 14. | August 26-27, 2015 Emails | D000841-42 |
| 15. | September 1-4, 2015 Emails | Harwood0000027-30 |
| 16. | October 22, 2015 Emails | D000761-63 |
| 17. | November 30, 2015 Letter from FAA | Harwood0000035-36 |
| 18. | January 2016 Emails | D000902-05 |
| 19. | January 25, 2016 FAA Authorization Form | Harwood0000032-34 |
| 20. | July 2015 Emails | D000806-09 |

This case is about American Airlines ("AA") making the conscious decision to "put multiple carts before the horse" when it came to the reemployment of Major General Thomas P. Harwood III ("Harwood"). The undisputed facts show that AA made the deliberate choice to violate the Uniformed Services Employment and Reemployment Rights Act ("USERRA") by refusing to reemploy Harwood promptly after his military service, as USERRA required AA to do, because AA unilaterally deemed Harwood to be unqualified to be reemployed, and further ignored the processes and protections of USERRA in a self-serving effort to supersede, nullify, and diminish as many of Harwood's rights and benefits of employment as possible. The undisputed facts of this case make clear that if Harwood had not suffered the misfortune of incurring a medical condition while on active military duty, the entire nucleus of facts in this case would have had a very different outcome. AA violated Section 4312 of USERRA by failing to reemploy Harwood into a proper escalator position until January 2016. Moreover, AA acted willfully and not reasonably or in good faith in order to shirk AA's obligations to assist disabled veterans. As demonstrated below, the facts warrant summary judgment in favor of Harwood.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**American Airlines and its Policies Impacting Pilots Who Have Military Obligations**

1. AA employs more than 15,000 pilots. Ex. 1 (Hansen Dep.) at 51:3-4. At any given time, approximately 200 to 300 of AA's pilots are on leave from AA due to military service. *Id*. at 53:6-10.

2. When Jerry Shaw was the Manager of Flight Crew Administration in New York, approximately 10 to 15 percent of AA's pilots based in New York had military commitments. Ex. 2 (Shaw Dep.) at 13:14-21.

3. AA has a Military Leave Policy that states, "American Airlines proudly supports all our employees who serve our country as members of the Uniformed Services, including members of

1

the Reserves and National Guard. We will provide employees with the benefits and leave available under the Uniformed Services Employment and Reemployment Rights Act and other law." Ex. 3 (Personal Leave of Absence Policy (D000032-33) at 33.

4. Pilots at AA who go out on military leave must give notice of their intent to return. Ex. 1 at 53:11-15.

5. Pilots who seek to return to AA after periods of military leave that are four months or greater must contact AA generally by contacting their chief pilots or their flight managers of administration. Ex. 1 at 56:5-57:6. The chief pilot or flight manager of administration then directs that pilot to coordinate with Sue Kalosa who handles long-term leave for pilots. *Id*. at 57:6-10. AA then examines whether the pilot seeking to be reemployed has met the USERRA requirements to be reemployed. *Id*. at 57:11-17. AA then reinstates pilots who conform with USERRA. *Id*. at 57:18-58:7.

6. AA utilizes a four-part bid status for pilots, which includes: a) the type of equipment flown, b) the seat being flown (either captain or first officer), c) the base, and d) domestic or international. Ex.1 at 58:17-59:6. Pilots returning from shorter-term leaves of less than four months return to their previous bid status or to one for which they could have bid and received. *Id*. at 59:7-9. Those pilots returning from longer-term leaves of more than four months may return to their previously held statuses or to any bid status in which someone junior to the returning pilot is flying. *Id*. at 59:9-11.

7. AA uses an "occupational seniority" list, which ranks pilots from 1 to 15,000 based upon their dates of hire. Ex. 1 at 60:18-61:6. A pilot's number on the list means that the pilot is junior to all those pilots whose numbers come before the pilot's and is senior to all those pilots whose numbers are lower. *Id*. at 61:7-62:4. AA also looks at relative seniority, which can change due

to the hiring and attrition of pilots. *Id.* at 62:5-7.

8.  AA understands that an employee returning from military leave is entitled to "prompt reemployment," which in most circumstances should be immediate. Ex. 1 at 64:16-65:5.

9.  AA returns pilots to their positions subject to USERRA rights. Ex. 1 at 62:8-15. At AA, being reinstated "subject to USERRA rights" means that a person may only be reinstated so long as the person is qualified for his position. *Id.* at 62:15-22.

10. Scott Hansen's understanding of this USERRA requirement comes from legal counsel, on the job training, some classes, and frequent contact with HR and legal. Ex. 1 at 63:4-15. Hansen is unsure of the source from which he gains the understanding that a veteran seeking reemployment must be qualified before he can be reemployed, but it has long been his understanding. *Id.* at 74:2-10. Hansen does not know of specific language in USERRA that requires a returning veteran to be qualified before being reemployed, but Hansen "knows it's there." *Id.* at 74:13-75:1, 82:5-14.

11. AA operates under the policy that a person must have a valid medical certificate both to be a pilot and to even train on new equipment. Ex. 4 (Kalosa Dep.) at 43:7-15. This is an FAA requirement "as best as [Sue Kalosa] knows," but Kalosa "do[esn't] know that [she] could point to a particular person or source" for that rule. *Id.* at 44:2-6, 64:14-65:6. Hansen is unaware of a requirement that a returning pilot needs a first class medical certificate to train. Ex. 1 at 139:6-8.

12. The training department at AA requires that a pilot have a first class medical certificate for pilots to train even in a simulator because without such a medical certificate, the training department considers the person to be unqualified. Ex. 2 at 41:13-21.

13. Scott Hansen is in charge of decisions made regarding pilots at AA returning from military leave, and Hansen holds to the policy that all pilots must be qualified before they may be

reemployed by AA.  Ex. 1 at 130:22-131:11.

14. Pilots typically fly between 73 and 93 hours per month at AA.  Ex. 1 at 88:5-10.  A pilot may fly for a maximum of 93 hours per month at AA.  *Id*. at 88:9.

15. AA does not have a written policy regarding whether a position for a returning veteran is similar in status to a veteran's former position.  Ex. 1 at 207:19-208:6.  In such situations, Hansen uses his own judgment and experiences and relies on the advice of human resources and counsel.  *Id*. at 208:3-8.

**Harwood's Military Service and Tenure with AA**

16. Thomas Harwood graduated from the United States Air Force Academy in 1981 with a B.S. in Economics, and he graduated number three in his graduating class.  Ex. 5 (Harwood Dep.) at 10:23-11:6.  Harwood received the Kennedy Fellowship to attend the John F. Kennedy School of Government at H6arvard University.  Ex. 6 (Harwood Decl.) ¶ 1.  Harwood graduated from the Kennedy School in 1983 with a Master's of Public Policy.  *Id*., ¶ 2.

17. After graduating from the Kennedy School, Harwood served on active duty in the Air Force from 1983 to 1991, during which he was an F-15 Eagle pilot and a T-38 Talon II instructor.  Ex. 6 ¶ 3.

18. Harwood voluntarily separated from active duty in the Air Force in August 1991 and then joined the Air Force Reserve as an F-16 Fighting Falcon pilot.  Ex. 6 ¶ 4.

19. Harwood obtained the rank of Brigadier General in the  Air Force on June 1, 2009.  Ex. 6 ¶ 5.  Harwood then obtained the rank of Major General on May 28, 2011.  *Id*., ¶ 6.

20. In summer to fall 1992, Harwood applied to work at AA as a pilot.  Ex. 5 at 14:10-15. AA hired Harwood as a pilot in October 1992.  Ex.7 (Hiring Letter).  Harwood began working at AA as a pilot on November 24, 1992.  Ex. 5 at 41:16-21.  At the time that he took military leave

starting in June 2013, Harwood was based out of New York La Guardia Airport. Ex. 4 at 146:18-147:2.

**Harwood's Military Leave from June 2013 to September 2015**

21. The Air Force assigned Harwood to a military tour of duty as the Chief, US Military Training Mission to the Kingdom of Saudi Arabia that began on June 24, 2013. Ex. 5 at 115:7-11; Ex. 8 (Discharge Order). This tour of duty ended on August 31, 2015. *Id.* Harwood returned to the United States in summer 2015. Ex. 6 ¶ 8.

22. During this tour of duty, on or about December 1, 2013, Harwood received a diagnosis of atrial fibrillation. Ex. 5 at 35:5-8.

**Harwood presented himself for reemployment in September 2015, in accordance with, and exceeding the requirements of § 4312**

23. On June 3, 2015, Harwood contacted Jerry Shaw and informed Shaw that he would be returning to AA from military leave in September 2015. Ex. 9 (June 2015 Emails) at 792. In his email of June 3, 2015, Harwood requested to bid "LGA/CA/737/D." *Id.* at 792. This bid status meant that Harwood had bid for an assignment to be a captain based out of LaGuardia Airport who would fly Boeing 737 Equipment on domestic routes. Ex. 2 at 16:12-21.

24. Shaw responded and told Harwood that Shaw would contact crew resources at AA in order to ensure that Harwood was able to hold the requested bid status, and a short time later, Shaw contacted Ken Blessum who worked in crew resources and had control over the seniority and bid statuses for AA pilots. Ex. 9 at 792; Ex. 2 at16:22-17:21.

25. Later, on June 3, 2015, Blessum confirmed that Harwood could hold his requested bid status, and Blessum informed Shaw that Harwood would need to be in contact with Sue Kalosa because Harwood's military leave had lasted more than four months. Ex. 9 at 791. Kalosa responded later that day and confirmed that Harwood needed to coordinate with her for his

reemployment at AA.  *Id*. at 791.

26. Harwood wrote to Jerry Shaw again in late July 2015 and informed Shaw that he would be released from active duty on August 31, 2015.  Ex. 10 (June and July 2015 Emails) at 793-94. Blessum told Harwood that he should be in contact with Sue Kalosa, and Harwood contacted Kalosa on July 29, 2015, and Harwood sent her a copy of his separation orders from the military. *Id*. at 793.  Harwood then sent Kalosa his returning four-part bid status on August 7, 2015.  Ex. 20 (July 2015 Emails) at 806.  Harwood later reconfirmed his intended return date with Lorraine Sutera on August 10, 2015.  Ex. 11 (Aug. 10, 2015 Email) at 1050-51.

27. Although he was not required to do so, Harwood began his attempts to obtain a first class medical certificate sometime in late July or early August 2015 in advance of formally presenting himself for reemployment to AA.  Ex. 5 at 36:19-37:17.  Harwood did so because he "was trying to be a good employee and present [himself] for employment with as little work for American Airlines to do as possible."  *Id*. at 37:4-6.  Harwood learned at some point during that time that there may be problems with his ability to obtain a first class medical certificate because of his atrial fibrillation.  *Id*. at 40:10-19.

28. Harwood contacted Marsha Reekie, a nurse who worked for the Allied Pilots Association, which is the labor union for pilots at AA, on August 5, 2015, to seek her advice and assistance on issues that might arise with Harwood's ability to obtain a first class medical certificate.  Ex. 12 (Aug. 5-7, 2015 Emails) at 1061-62.  Reekie (not an AA employee) offered advice regarding treatment options and obtaining a first class medical certificate.  *Id*. at 1060-61.

29. Harwood sent an email to Lorraine Sutera, a staff assistant in the New York flight office of AA, on August 20, 2015 that alerted Sutera that Harwood was "running into some complications in getting a Medical" and informed Sutera that it may affect his training start date

of September 5, 2015.  Ex. 13 (Aug. 20-21, 2015 Emails) at 1018.  Jerry Shaw, who had been

copied on the email, wrote to Harwood later that day and asked Harwood to "let [him] know as

soon as possible if the medical is going to take some time so we can avoid setting up training that

you will not be able to attend."  *Id*. at 1018.

30. Shaw made a phone call to Harwood on August 26, 2015.  Ex. 5 at 226:2-6; Ex.1 at

43:10-14; Ex. 14 (Aug. 26-27, 2015 Emails) at 841.

31. During that telephone call, Shaw told Harwood that AA would not train Harwood unless

Harwood had received a first class medical before training.  Ex. 2 at 43:15-44:8.  Shaw made this

statement because "that's kind of been the rule of thumb for the last 17 years that [he has] been

with American."  *Id*. at 44:5-6.

32. During the telephone call between Harwood and Shaw, there was a discussion about

Harwood's sick leave balance.  Ex. 5 at 226:10-227:3; Ex. 2 at 49:7-13.  At the time of this

telephone call on August 26, 2015, Harwood had a balance of 854 hours of sick leave, all of

which he had earned prior to Harwood's military deployment.  *Id*. at 49:7-13.  Shaw commented

that Harwood "had a lot of sick time, which is a good thing…" *Id*. at 51:2-7.  And Harwood

suggested to Shaw that Harwood might possibly be treated like any other pilot (according to the

collective bargaining agreement), after reemployment.  *Id*. at 51:8-10.

33. Shaw suggested that Harwood should "stay in the military" because Shaw assumed such

an option existed.  Ex. 2 at 51:20-52:2, 52:9-22.

34. Shaw had never experienced a pilot being employed or reemployed without a first class

medical, including first officers and new hires.  Ex. 2 at 53:1-8.  Shaw had no understanding that

Harwood presenting himself for reemployment under USERRA made Harwood different from a

new hire.  *Id*. at 53:9-11.

35. Although not immediately relevant in this case because Harwood was not reemployed in accordance with the statute, nor assisted in any way to become qualified for his "escalator position" until Jan. 26, 2016, if Harwood had developed atrial fibrillation while he was an active pilot at AA and not while out on military leave, Harwood would have had full access to his bank of sick leave, including during the time while Harwood waited to receive a first class medical certificate or waiver from the FAA.  Ex. 2 at 49:19-50:13; Ex. 1 at 86:18-87:19.

36. From Shaw's email communication of August 26, 2015, Sue Kalosa gleaned that she could ignore any issues concerning Harwood's reemployment, but instead focused on Shaw's overstated assertion that Harwood expected simply to use sick leave.  Ex. 4 at 49:10-50:2.

37. Sue Kalosa then had a telephone call with Harwood on August 27, 2015, which Kalosa described as "horrible."  Ex. 14 at 841.  During that telephone call, Kalosa suggested to Harwood that AA could delay his reemployment and "allow" him to be unemployed for up to two years under USERRA's convalescence provision.  Ex. 4 at 50:11-51:4.  Kalosa asserted "under no circumstances would AA ever reemploy a pilot without a medical."  Ex. 5 at 60:17-61:1.  Kalosa asked Scott Hansen to assist her in dealing with the issues surrounding Harwood's reemployment.  *Id*. at 52:20-53:13; Ex. 14 at 841.

38. Harwood emailed Scott Hansen on September 1, 2015. Ex. 15 (Sept. 1-4, 2015 Emails) at 29.  Harwood noted that he had been working with the New York flight office and Sue Kalosa since July 2015 and that he had been honorably discharged as of August 31, 2015.  *Id*.  Harwood asked Hansen to confirm that Harwood would be reemployed as of September 1, 2015.  *Id*.

39. Hansen responded later on September 1, 2015 and wrote:  "Absolutely.  You will be returned to active employment based upon your notification to the company and presuming you meet USERRA guidelines and company policy for reemployment.  So long as you have a current

and valid medical, and are available for training, you're good to go." Ex. 15 at 28-29.

40. Harwood responded on September 1, 2015 and wrote, "I've notified the company and meet USERRA guidelines." Ex. 15 at 28. Harwood noted that he believed the requirement that he possess a valid medical certificate impermissibly added requirements to those found in Section 4312 of USERRA. *Id.* Harwood further asked for clarification of company policy if Harwood was unable to get a valid medical certificate or a waiver from the FAA. *Id.*

41. Hansen responded three days later on September 4, 2015 and told Harwood that he "[met] the general requirements for reemployment under USERRA (qualifying discharge, timely return, etc.) and we're willing to put you back to work **in a reasonable time**." Ex. 15 at 27 (emphasis added). Hansen went on to state that while Harwood met the basic requirements to be reemployed, Harwood was not qualified to be reemployed and therefore only Section 4313 of USERRA applied. *Id.*

**AA recognized that Harwood had satisfied the USERRA requirements for reemployment, but did not reemploy Harwood because it deemed him unqualified.**

42. According to Hansen, Harwood met the four qualifications under USERRA to be returned to employment: a) Harwood gave timely notice of his need to perform military service, b) Harwood performed military service for less than five years, c) Harwood gave notice to return in a timely manner, and d) Harwood was honorably discharged. Ex. 1 at 174:9-175:21.

43. According to Kalosa, when Harwood gave notice to AA on September 1, 2015, Harwood satisfied the four USERRA requirements, but Harwood was "unqualified" to be a pilot because Harwood did not have a valid first class medical certificate at that time. Ex. 4 at 43:7-15.

44. Hansen would not, under any circumstances, have returned Harwood for training on September 1, 2015 because Hansen did not consider Harwood to be qualified to be a pilot, due to Harwood's difficulty in obtaining a medical certificate. Ex. 1 at 141:7-17.

45. Hansen had no concern that the FAA would discipline AA for training Harwood if Harwood lacked a medical certificate. Ex. 1 at 142:11-16. Hansen had concerns that training Harwood while Harwood lacked a first class medical certificate "would be violating the USERRA provision for qualification." *Id*. at 142:17-143:4.

46. Hansen made the decision to not reemploy Harwood on September 1, 2015, but according to Hansen, "it was not…in the sense that this was specific to Captain Harwood or any other specific pilot, but, in fact, was a long-term practice of the airline not to impose a qualification requirement, but, rather, to comply with the USERRA law as we understood it." Ex. 1 at 81:19-82:4. Hansen based his decision in his understanding that in order for Harwood to be reemployed on September 1, 2015, Harwood had to be qualified -- "As a pilot. As a pilot." *Id*. at 100:18-22.

47. Hansen worried that returning Harwood to reemployment would cost AA money and establish a poor precedent. Ex. 1 at 166:15-168:3.

**AA later identified a position not similar in status as an alternative to reemploying Harwood as a pilot.**

48. Hansen sought out and later attempted to create a position that he thought would meet the terms of USERRA for Harwood because Hansen thought a clear equivalent position did not exist. Ex. 1 at 209:22-210:7. Hansen sought HR's opinion as to whether the position offered met USERRA protections of returning veterans' seniority, status, and pay. *Id*. at 210:4-7.

49. AA, through counsel, presented two options to Harwood on October 22, 2015, which was more than six weeks after Harwood initially presented himself for reemployment. Ex. 16 (Oct. 22, 2015 Emails). In presenting these options, AA reaffirmed that it could not reemploy Harwood as a pilot because it deemed him unqualified. *Id*. at 761. Under the first option, AA agreed to extend Harwood's military leave (again "allow" him to remain unemployed) to provide

Harwood with no pay, and no benefits of employment. Harwood had to seek a waiver from the FAA at his own expense even though AA promised reasonable assistance to Harwood. *Id*. The second option was reemployment in AA's Flight Technical Operations Group at the American Airlines Flight Academy located near Dallas-Fort Worth International Airport in Texas. *Id*.

50. At the time of the offer to work in the Flight Technical Operations Group, Harwood lived in Alexandria, Virginia. Ex. 6 ¶ 8. Harwood had moved to Alexandria only a few months prior after a two year stint in Riyadh, Saudi Arabia. *Id*., ¶ 7.

51. Reassignment of a pilot to the Flight Technical Operations Group did not comport with any contract, agreement, plan, policy, or practice of AA. Ex. 5 at 264:14-18. This practice was also different than treatment of pilots at AA who do not serve in the military. *Id*. at 264:17-24.

**Harwood returned to military service from November 2015 through January 7, 2016.**

52. On November 9, 2015, Harwood informed AA that he would be beginning new active duty orders with the Air Force on November 16, 2015. Def.'s Answer, Dkt. No. 21, ¶ 54.

53. Harwood completed a nuclear stress test at the FAA's request in October 2015, which he did as part of his effort to obtain a waiver for his first class medical certificate. Ex. 6 ¶ 9.

54. On November 30, 2015, the FAA informed Harwood that it could still not certify him to hold a medical certificate and requested more information from Harwood. Ex. 17 (FAA Nov. 30, 2015 Letter).

55. Harwood served in the Air Force from November 17, 2015 through January 7, 2016. Ex. 6 ¶ 10. This period of time included some leave that Harwood had earned during his tour of duty in Saudi Arabia, but that he had been unable to use due to the demands of his duties during that time. *Id*.; Ex. 5 at 142:15-143:4.

**Harwood finally accepted a position in the Flight Technical Operations Group in January 2016 in an effort to mitigate the damages caused by AA's refusal to reemploy him in his escalator position and refusal to assist him to become qualified for his escalator position.**

56. On January 21, 2016, American Airlines reoffered the position in the Flight Technical Operations Group at Dallas-Fort Worth Airport to Harwood. Def.'s Answer, Dkt. No. 21, ¶ 54.

57. In January 2016, Harwood had a telephone conversation with Hansen who described the position in the Flight Technical Operations Group, and how desperate AA had become for help in that department because of the merger with US Airways, that had previously been offered to Harwood in October 2015. Ex. 5 at 238:24-239:13.

58. Harwood eventually accepted this position because he would not otherwise be earning pay or have health insurance benefits. Ex. 6 ¶ 11.

**Harwood received a waiver from the FAA in late January 2016, at which time AA reemployed Harwood as a pilot. Training did not begin until mid-February 2016**

59. AA scheduled Harwood to begin working in the Flight Technical Operations Group at Dallas-Fort Worth Airport on January 27, 2016. Ex. 18 (Jan. 2016 Emails) at 902-04.

60. On January 25, 2016, two days before Harwood was supposed to begin training in the Flight Technical Operations Group, the FAA issued Harwood an Authorization for Special Issuance of a Medical Certification. Ex. 19 (Jan. 25, 2016 Authorization).

61. AA reemployed Harwood as a pilot at that time in January 2016 because Scott Hansen deemed Harwood "qualified" to be eligible for reemployment. Ex. 1 at 255:10-18.

62. After Harwood learned that he would be reemployed as a pilot, he studied for several weeks until training began in mid-February. Ex. 5 at 193:23-194:9. Harwood then completed two weeks of academic, non-simulator training. *Id*. at 194:10-14. Harwood then completed about two weeks of simulator training for a Boeing 737. *Id*. at 194:14-15. Harwood then took a type-rating evaluation from the FAA in the simulator. *Id*. at 194:14-15. After Harwood received

a type rating, he started initial operating experience, in which he flew about 30 hours as a trainee pilot of a Boeing 737 along with an experienced pilot. Harwood finally completed an evaluation with an FAA evaluator who sat in the airplane's jump seat as Harwood piloted a plane from Dallas-Fort Worth Airport to Kansas City, Missouri. *Id*. at 195:1-6. After this point, AA began to schedule Harwood as a captain of Boeing 737 flights. *Id*. at 195:6-8.

63. Harwood waited about three weeks with full pay and benefits from his reemployment date to begin any training to be a Boeing 737 pilot, per contract and agreement. Ex. 6 ¶ 12. Harwood then trained for about four weeks in a classroom and/or simulator setting upon his reemployment in January 2016. *Id*.

## I.  Summary Judgment Standard.

Under Rule 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*.

## II.  American Airlines improperly considered Harwood's qualifications for duty before reemploying him as a pilot in violation of USERRA.

### A.  USERRA requires an employer to promptly reemploy a person returning from military leave before considering that employee's qualifications.

USERRA protects the rights of veterans and members of the military to reemployment. *Butts v. Prince William Co. School Bd.*, 844 F.3d 424, 430 (4th Cir. 2016). Section 4312 of USERRA mandates that an employee who takes leave because of service in a uniformed service

shall be reemployed if: a) the employee or an appropriate military officer gave the employer

advance notice of the service (with exceptions), b) the cumulative length of non-exempt periods

of military service during the employee's employment relationship with the employer does not

exceed five years, c) after completing the service, the employee timely returned to the employer

or applied for reemployment, and d) the employee was separated from the service without one of

the eight disqualifying discharges listed in Section 4304(1) through (4) as repeated in 20 CFR

1002.135(a) through (d). 38 U.S.C. § 4312(a). Section 4312: "**requires** employers to rehire

veterans when they return from service if those veterans satisfy the criteria [of 4312]." *Butts*,

844 F.3d at 430 (emphasis added). An employer may not establish any additional prerequisites

to reemployment that are greater than the requirements under USERRA. 38 U.S.C. § 4302(b).

For this reason, courts have routinely held that the question of whether an employee who

presents himself for reemployment is qualified is a question that may only be analyzed ***after***

reemployment. *Petty v. Metropolitan Gov't of Nashville-Davidson Co*., 538 F.3d 431, 441 (6th

Cir. 2008) (subjecting returning service member to return-to-work procedures to ensure he was

qualified for duty constituted unlawful prerequisite to prompt reemployment); *United States v.*

*Nevada*, No. 3:09-cv-00314-LRH-WGC, 2012 WL 1517296, at *2 (D. Nev. Apr. 30, 2012)

("qualifications are relevant only in determining the appropriate position of reemployment under

Section 4313, not the existence of the right to reemployment generally."); *Brown v. Prairie*

*Farms Dairy, Inc*., 872 F. Supp. 2d 637, 645 (M.D. Tenn. 2012) ("once Plaintiff has satisfied the

prerequisites in Section 4312 – which the Court has already found Plaintiff to have done – then

Plaintiff must be reemployed, and only then, when determining the particular position in which

to reemploy Plaintiff, can Defendant consider Plaintiff's qualifications."). Section 4313, which

determines the appropriate position to which the veteran must be returned, takes effect only ***after***

the veteran or service member is reemployed. *Butts*, 844 F.3d at 430 (citing *Petty*, 538 F.3d at 439-40; setting forth §§ 4312 & 4312 standards in Fourth Circuit).

**B.    AA improperly considered Harwood's qualifications before reemploying Harwood and illegally denied Harwood prompt reemployment.**

**1.    AA acknowledges that Harwood met the requirements of § 4312.**

Despite its knowledge of USERRA and the significant number of pilots with military service that it employs, AA deliberately and improperly considered Harwood's qualifications before it reemployed him.  Both Scott Hansen and Sue Kalosa, the decision makers governing AA's decision not to reemploy Harwood on September 1, 2015, admit that Harwood satisfied the four requirements in Section 4312 of USERRA when he presented himself for reemployment.  SMF ¶¶ 42-43.  Hansen admits that Harwood:  a) gave timely notice of his need to perform military service, b) that Harwood performed five years or less of non-exempt military service, c) that Harwood presented himself for reemployment in a timely manner, and d) Harwood was honorably discharged from the Air Force.  SMF ¶ 42.  Thus, AA readily admits that Harwood satisfied all the criteria (and the only lawful criteria) under 4312.  Harwood submits that on this evidence and admission alone, he should have been promptly reemployed in his escalator position, regardless of his health status or his having a first class medical certificate or any other consideration not found in 4312.

**2.    AA refused to reemploy Harwood because it deemed him unqualified to be reemployed based on AA's deeply flawed implementation of USERRA and rejection of any burden imposed by a disabled veteran.**

In this case, despite USERRA's requirements, AA deliberately chose another path, because the lawful path would "cost them money."  AA purports to return veterans to their positions as pilots "subject to USERRA rights."  SMF ¶ 9.  But as the facts of this case show at AA, being returned to employment "subject to USERRA rights" requires that a veteran must be

deemed qualified before he or she can be reemployed. SMF ¶ 9. Scott Hansen is ultimately in charge of decisions regarding the reemployment of pilots at AA after military service, and Hansen, thus AA, holds to a policy that all veterans must be qualified <u>before</u> they can be reemployed. SMF ¶ 13. Hansen gleans this gross misstatement of the requirements of Section 4312 from legal counsel, on the job training, some classes, and interaction with HR. SMF ¶ 10. Hansen has long had a convenient "understanding" that USERRA requires a veteran to be qualified for "the job they are seeking," like a new hire, before reemployment, so as to avoid the potential burden on the bottom line. *Id.* Hansen admits that he does not know of specific language in USERRA that requires a returning veteran to be qualified before reemployment, but Hansen "knows it's there." *Id.*

Other employees relied upon similar gross misstatements of the law. Sue Kalosa, through whom all pilots returning from military service of greater than four months must coordinate their return, testified that although Harwood met the requirements of Section 4312, AA could not reemploy him because he was not "qualified" due to his inability to obtain a valid medical certificate before September 2015. SMF ¶ 43. Jerry Shaw, who was then AA's Manager of Flight Crew Administration in New York, admitted to telling Harwood in August 2015 that Harwood could not be reemployed and receive training because Harwood had not yet received a first class medical certificate. SMF ¶ 31. Shaw admits that he made this statement to Harwood because, in Shaw's words, "that's kind of been the rule of thumb for the last 17 years [that Shaw] has been with American." SMF ¶ 32.

### 3.    AA unlawfully refused to reemploy Harwood, unlawfully citing his qualifications before reemployment.

Harwood first contacted AA regarding his intent to return to employment as a pilot after a tour of duty in Saudi Arabia on June 3, 2015. SMF ¶¶ 23-26. Although not required to do so

under the law, Harwood began attempts to obtain a first class medical certificate in late July or early August 2015 because Harwood "was trying to be a good employee and present [himself] for employment with as little work for American Airlines to do as possible." SMF ¶ 27. In this process, Harwood first learned that he might have trouble obtaining a medical certificate from the FAA due to his atrial fibrillation that had incurred during his tour of duty. SMF ¶¶ 27-28.

Harwood alerted Lorraine Sutera in the New York flight office of these potential complications with obtaining a medical certificate on August 20, 2015. SMF ¶ 29. Shaw, who had been copied on the email, responded and asked Harwood to let him know as soon as possible about any issues with obtaining a medical certificate because it might impact Harwood's training. *Id*. Shaw admits that in a follow-up telephone call to Harwood, Shaw told Harwood that Harwood could not be reemployed or trained until Harwood possessed a valid medical certificate from the FAA. SMF ¶ 31. Harwood suggested that perhaps Harwood be treated like any other pilot at AA after he was returned to employment. SMF ¶ 32. This was one idea, and although it would have let AA shirk some of AA's obligations under 4313, it would have allowed Harwood to get back on payroll and avoid a dispute. *Id*. Shaw, then Kalosa, then Hansen, all informed Harwood that even allowing AA to avoid and/or shirk <u>some</u> of their § 4313 obligations was not good enough. Harwood had to give up (later negotiate for) <u>all</u> his rights and benefits of employment -- because AA deemed Harwood unqualified to be reemployed. SMF ¶ 33. And Shaw recommended that Harwood should "stay in the military" because Shaw assumed such an option existed for Harwood, and obviously such an option would bolster the longstanding corporate commitment to the bottom line at the expense of disabled veterans. *Id*. Indeed, to this day, AA rejects any obligation to reemploy a disabled veteran to the escalator position, or to provide any real assistance to qualify the disabled veteran, instead insisting AA

can supersede, nullify, and diminish any right or benefit of employment as it suits AA at the time, and skip the processes and protections that AA finds burdensome.

When Harwood spoke with Kalosa on August 27, 2017, Kalosa suggested that Harwood should remain on military leave for up to two years under USERRA's convalescence provision, again so as not to burden AA with Harwood's disability. When questioned about military leave while not performing military service, Kalosa made it clear AA planned to supersede Harwood's reemployment rights whether Harwood "volunteered" to go away or insisted on reemployment. SMF ¶¶ 36-37. Kalosa then asked Hansen for his assistance. SMF ¶ 37. Hansen and Harwood then exchanged a series of emails between September 1 - 4, 2015. SMF ¶¶ 38-41. Hansen put in writing the unlawful practice of superseding reemployment rights with company policy, with the words "meet USERRA guidelines and company policy for reemployment." Harwood was told he could be reemployed as of September 1, 2015: "so long as [Harwood] [had] a current and valid medical…" SMF ¶ 39. Harwood responded that Harwood believed the requirement of a medical certificate was an impermissible additional requirement to be reemployed beyond those requirements found in Section 4312 of USERRA. SMF ¶ 40. Hansen responded to Harwood three days later and told Harwood that while Harwood "[met] the general requirements for reemployment under USERRA (qualifying discharge, timely return, etc.)" and told Harwood that "we're willing to put you back to work in a reasonable time." SMF ¶ 41 (emphasis added). Hansen confirmed to Harwood that although Harwood met the requirements for reemployment under Section 4312, AA would not reemploy Harwood as a pilot because he was not qualified to be reemployed under Section 4313 of USERRA. *Id.* And in fact AA did not reemploy Harwood on September 1, 2015 or any day soon thereafter.

Hansen admits he would not have returned Harwood for training under any circumstances

without a medical certificate because Hansen did not consider Harwood to be qualified for reemployment before Harwood held this certificate. SMF ¶ 44. Hansen did not have concerns that the FAA would punish AA for training Harwood without a valid medical certificate, but Hansen feared that he may get in trouble with AA for "violating the USERRA provision for qualification." SMF ¶ 45. Hansen, in testimony, let slip the real reason, unstated at the time, to refuse to return Harwood to employment because Hansen believed such an action would cost AA money and establish poor precedent. SMF ¶ 47. AA makes clear it must be allowed to supersede, nullify, and diminish the rights of disabled veterans and taking the lawful path required by USERRA would certainly be a poor precedent from that point of view.

There can be no dispute that AA violated USERRA by putting the § 4313 qualification "cart" before the § 4312 reemployment "horse." The AA decision makers admit repeatedly that they refused to reemploy Harwood on September 1, 2015 precisely because they deemed Harwood to be unqualified for his escalator position, (New York, 737, Captain, Domestic) in August 2015. As the Sixth Circuit articulated in *Petty*, "Congress recognized that USERRA would limit the ability of employers to rescreen returning veterans, but still chose to make this the general rule under USERRA." *Petty*, 538 F.3d at 442. For this reason, Section 4302 of USERRA provides that USERRA supersedes any contract, agreement, policy, plan, or practice that reduces, limits, or eliminates rights under USERRA. *Id.*; 38 U.S.C § 4302(b). And USERRA explicitly supersedes "the establishment of additional prerequisites to the exercise of any such right or the receipt of any such benefit." 38 U.S.C. § 4302(b).

The additional pre-requisite that AA imposed on Harwood (having a valid first class medical certificate) is analogous to the return-to-work process to which the government of Nashville subjected Brian Petty. *See Petty*, 538 F.3d at 441. The Sixth Circuit found Nashville's

return-to-work process, to which all employees were subjected, to be an unlawful additional pre-requisite because it was a pre-requisite **that was additional to what Congress had prescribed** in order to be reemployed under USERRA. *Id*. at 442. AA's requirement that Harwood possess a valid medical certificate is a similar unlawful pre-requisite because it goes beyond what Congress required for reemployment under USERRA.

This additional pre-requisite that required Harwood to prove medical fitness for reemployment is also analogous to the physical qualification improperly considered by Prairie Farms Dairy when it refused to reemploy Jerry Brown after Brown informed Prairie Farms that he had suffered a wrist injury while on active duty and did not produce medical documentation that Brown was qualified to perform his duties in order to be reemployed. *Brown*, 872 F. Supp. 2d at 639-40. As the *Brown* Court held, once a plaintiff satisfies the pre-requisites under Section 4312, "then the Plaintiff must be reemployed, and ***only then***, when determining the particular position in which to reemploy Plaintiff, can Defendant consider Plaintiff's qualifications." *Id*. at 645 (emphasis added). But AA did precisely what the *Brown* Court held USERRA forbids when it imposed a "practice" or "general rule of thumb" that a pilot must prove his medical qualification before being reemployed.

AA's illegal actions are only confirmed by its later acts of reemploying Harwood in January 2016 as a pilot after he obtained an FAA waiver. AA reemployed Harwood at this time because, due to Harwood's obtaining FAA medical clearance, Hansen then deemed Harwood to be "qualified" for reemployment. SMF ¶ 61. This undisputed admission clearly demonstrates that AA blatantly violated USERRA because it expressly considered Harwood's qualifications before agreeing to his reemployment.

      **4.**     **An alleged policy or plan that is purportedly based in USERRA does not save AA from liability.**

USERRA's Section 4312 is a strict liability statute.  AA is not saved by the fact that it relied upon a practice or policy (or legal advice) that is purportedly based on what AA, either as a corporation or through its agents, thinks USERRA requires.  Hansen, Kalosa, and Shaw all testified that AA's act of not reemploying Harwood was an act based in USERRA and that it was a long-standing practice.  SMF ¶¶ 9-12, 31, 42-45.  Indeed, while Hansen cannot name where in USERRA there exists a requirement that a veteran must prove qualifications before reemployment, he testified that he "knows it's there."  SMF ¶ 10.  And the purported requirement that pilots returning from military service must prove a pre-reemployment qualification of having a medical certificate exists "as best as [Sue Kalosa] knows," but Kalosa admits that she "do[esn't] know that [she] could point to a particular person or source" for that rule.  SMF ¶ 11.  Indeed, any such requirement, even to train a returning pilot in a simulator, comes from the AA training department's unilateral determination that such pilots are "unqualified" to be trained unless they have a first class medical certificate.  SMF ¶ 12.

Instead, contrary to the twisted interpretations held by AA and its management responsible for reemploying veterans returning from serving their country, Section 4302(b) clearly states that:  "[USERRA] **supersedes any** State law (including any local law or ordinance), contract, **agreement, policy, plan, practice, or other matter that reduces, limits, or eliminates in any manner any right or benefit provided by this chapter, including the establishment of additional prerequisites to the exercise of any such right or the receipt of any such benefit**."  38 U.S.C. § 4302(b) (emphasis added).  USERRA then, as passed by Congress and signed into law by the President, supersedes any policies in place by AA or requirements of the FAA that impede the right of a veteran to be reemployed.  The fact that certain AA employees or lawyers incorrectly believe that USERRA says something it does not

say is of no consequence.  Section 4312 imposes strict liability for failure or refusal to promptly reemploy a returning service member. *Mace v. Willis*, 259 F. Supp. 3d 1007, 1016 (D.S.D. 2017).  Since there exists no factual dispute that AA violated Section 4312 by not reemploying Harwood on September 1, 2015, the Court should grant Harwood summary judgment.

### III.  American Airlines violated Section 4313 because it failed in its 4312 duties and because it failed to place Harwood into a proper escalator position.

The Fourth Circuit has made clear that if a veteran satisfies the USERRA criteria for reemployment under Section 4312, then Section 4313 governs the proper position to which a veteran is entitled upon his or her return.  *Butts*, 844 F.3d at 430.  For those employees whose period of military leave lasts more than 90 days, the veteran is entitled to be reemployed "in the positon of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service, or a position of like seniority, status, and pay, duties of which the person is qualified to perform."  38 U.S.C. § 4313(a)(2)(A).  If a returning veteran is not qualified to perform the duties of a position described under Section 4313(a)(2)(A), *after reasonable efforts by the employer to qualify the person*, then the veteran may be employed "in the position of employment in which the person was employed on the date of the commencement of the service in the uniformed services, or a position of like seniority, status, and pay, the duties of which the person is qualified to perform."  38 U.S.C. § 4313(a)(2)(B) (emphasis added).

The position described by Section 4313(a)(2)(A) is known in USERRA parlance as the "escalator position," which means it is "the position a veteran 'would have attained with reasonable certainty if not for the absence due to uniformed service.'"  *Butts*, 844 F.3d at 431 (quoting 20 C.F.R. § 1002.191).  The escalator position is "considered the 'starting point for determining the proper reemployment position.'"  *Id*. at 431 (quoting 20 C.F.R. § 1002.192).  In

the Fourth Circuit "the veteran is either employed to the position he or she would have attained but for his or her service, or, if unqualified for the escalator position—despite reasonable efforts to make him or her qualified—to the same position held prior to service." *Id.* at 431.

In determining whether a position is of like status, courts typically consider "the totality of the circumstances." *Crawford v. Dep't of the Army*, 718 F.3d 1361, 1366 (Fed. Cir. 2013). "Status" of a position of reemployment may include "opportunities for advancement, general working conditions, job location, shift assignment, rank, responsibility, and geographical location." 20 C.F.R. § 1002.193(a). USERRA's legislative history notes that: "A reinstatement offer in another city is **particularly violative** of like status, as would be reinstatement in a position that does not allow for the use of specialized skills in a unique situation." Kathryn Piscitelli & Edward Still, *The USERRA Manual: Uniformed Services Employment & Reemployment Rights*, § 5:8 (West 2017) (citing H.R. Rep. No. 103-65, pt. 1, at 31 (1993), *reprinted in* 1994 U.S.C.C.A.N. 2449, 2464). Also, if an employee refuses to accept a reinstatement offer of a position that is of inferior status to the position to which the employee is entitled, the employee's refusal of the offer would not result in a waiver of the employee's rights under the Act. H.R. Rep. No. 103-65, pt.1, at 39 (1993), as reprinted in 1994 U.S.C.C.A.N. 2449, 2472 ("a veteran or reservist does not waive his or her rights under the Act by refusing an offer of reemployment which extends anything less than full statutory guarantees, including proper seniority, position, pay, and lost wages and benefits") (citing *Hanna v. Am. Motors Corp.*, 724 F.2d 1300, 1312-13 (7th Cir. 1984); *Stevens v. Tenn. Valley Auth.*, 699 F.2d 314, 316 (6th Cir. 1983); *Ryan v. Rush Presb.-St. Lukes Med. Ctr.*, 15 F.3d 697, 699 (7th Cir. 1994) ("an employee does not waive her rights under the [reemployment statute] by refusing to accept an inferior position."); *Davis v. Crothall Servs. Group, Inc.*, 961 F. Supp. 2d 716, 733 (W.D. Pa.

2013) (veteran not required to accept offer of position that does not comply with USERRA to preserve veteran's rights under USERRA.)

### A. American Airlines necessarily violated Section 4313 of USERRA because it violated Section 4312 by failing to reemploy Harwood.

The position to which a veteran is entitled under Section 4313 flows from the veteran's right to reemployment under Section 4312. *Butts*, 844 F.3d at 430. The *Brown* Court held that when the employer fails to reemploy a veteran it has an obligation to reemploy, "it follows that Defendant necessarily failed to fulfill its obligations under Section 4313." *Brown*, 872 F. Supp. 2d at 645. As demonstrated *supra,* there is no dispute that Harwood met the Section 4312 requirements to be reemployed. Therefore, nothing that happened between September 1, 2015 and January 26, 2016 is relevant under § 4313. Only after January 26, 2016 was it in any way possible for AA to comply with § 4313. SMF ¶¶ 42-43. Even if one ignores the relevancy, there is no dispute that AA explicitly refused to reemploy Harwood to the escalator position to which he was lawfully entitled on September 1, 2015 because it deemed him unqualified prior to reemployment, and prior to any effort to assist Harwood to become qualified. *See* 20 C.F.R. 1002.198(b) ("**Only after** the employer makes reasonable efforts…may it determine that the employee is not qualified for the reemployment position." (emphasis added). See *Rivera-Melendez v. Pfizer Pharms., LLC*, 730 F.3d 49, 54 (1st Cir. 2013) (noting that "[i]f, and only if," returning service member is not qualified to perform position described in 4313(a)(2)(A) after employer has made reasonable efforts to qualify him, employer may reemploy him in position described in 4313(a)(2)(B)). SMF ¶¶ 42-43. As detailed extensively in Section II, B, *supra*, AA's position violated Section 4312 because it put the cart of qualification before the horse of reemployment. Thus, AA necessarily violated Section 4313 because of its blatant violation of Section 4312. The Court should grant summary judgment in favor of Harwood on this claim too.

**B.** **The position to which AA attempted to appoint Harwood would have violated Section 4313.**

Even if this Court decides that AA did not inherently violate Section 4313 when it refused to reemploy Harwood, AA still cannot be saved by its offers to reemploy Harwood in a position in the Flight Technical Operations Group. First, veterans are not required to negotiate for work from a position of unemployment. This kind of abuse of corporate coercive power is explicitly prohibited by USERRA. Congress, not AA, determines eligibility for reemployment , and Congress obligates all employers, including AA, to reemploy every eligible veteran to the escalator position, at least initially, and then assist disabled or otherwise unqualified veterans to become qualified, until such efforts create an "undue hardship." This position was located near Dallas-Fort Worth Airport in Texas. It was not the escalator position to which Harwood was entitled, and for which AA made no effort to assist Harwood to become qualified, and not compliant with the § 4313 processes to find and disclose all equivalent positions. SMF ¶ 49. Even ignoring all that, at the time, Harwood still lived in Alexandria, Virginia. SMF ¶ 50. And Harwood had only recently moved to Alexandria after living in Saudi Arabia for two years as part of his duties in the Air Force. *Id*. Prior to his tour of duty that began in June 2013, Harwood was a pilot based out of New York La Guardia Airport. SMF ¶ 20. The Dallas assignment did not comport with any contract, agreement, plan, policy, or practice utilized at AA. SMF ¶ 51. And Harwood also observed that the act of placing him in a non-pilot position in a distant city was different than the treatment of pilots by AA who had not served in the military. *Id*. A position more than 1,000 miles from Harwood's home and base city, which did not afford him the ability to be employed as a pilot (even to train) is exactly the kind of situation that Congress envisioned as "particularly violative" of the like status requirement of USERRA. *See* USERRA Manual, § 5:8; *Armstrong v. Cleaner Services, Inc*., 1972 WL 756 (M.D. Tenn.

1972).  The Court should grant summary judgment in Harwood's favor.

## IV.    AA cannot succeed on its affirmative defense that it acted reasonably or in good faith or that its actions were not willful.

Because AA blatantly violated both Sections 4312 and 4313 of USERRA, AA may attempt to escape imposition of liquidated damages by showing that it acted reasonably and in good faith and not willfully or recklessly toward Harwood.  Indeed, in its Third Affirmative Defense to Harwood's Complaint, AA pled that it "acted reasonably and in good faith toward Plaintiff and did not violate any rights which may be secured to Plaintiff under any federal, state, or local law, rule, ordinance, regulations, constitution, or guidelines."  Def's Answer, Dkt. No. 21 at 10.  And in its Eighth Affirmative Defense, AA averred that it "did not at any time engage in unlawful, reckless, willful, wanton, or malicious conduct toward Plaintiff with the intent to injure him or with knowledge or belief that injury was substantially certain to occur."  *Id*. at 11.

USERRA provides plaintiffs with remedies that include:  compelling the employer's compliance with USERRA, monetary damages for lost wages and benefits that are a result of USERRA violations, and liquidated damages that equal the lost wages and benefits when a USERRA violation is deemed willful.  *Butts*, 844 F.3d at 433.  Under the liquidated damages provision, successful USERRA plaintiffs are entitled to a doubling of backpay upon a showing of willful conduct by the employer.  *Serricchio v. Wachovia Secs. LLC*, 658 F.3d 169, 191 (2d Cir. 2011).  Willfulness is deemed present when "'the employer either knew or showed reckless disregard for whether its conduct was prohibited by [USERRA].'"  *Davis v. Crothall Servs. Grp., Inc.*, 961 F. Supp. 2d 716, 735 (W.D. Pa. 2013) (quoting 20 C.F.R. § 1002.312(c)).  Successful USERRA plaintiffs may show recklessness through circumstantial evidence.  *Paxton v. City of Montebello*, 712 F. Supp. 2d 1017, 1021 (C.D. Cal. 2010).  And "[w]illfulness is not the same as discrimination."  *Mace*, 259 F. Supp. 3d at 1022.  Even under the strict-liability constructs of

Sections 4312 and 4313 of USERRA, an employer's conduct may still be willful.  *Id.*

The Second Circuit held that when "'an employer acts reasonably [under USERRA] in determining its legal obligation, its action cannot be deemed willful.'"  *Serricchio*, 658 F.3d at 191 (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 n. 13 (1988)). In *Serricchio*, the Second Circuit affirmed a conclusion that a defendant willfully violated USERRA when it failed to promptly reemploy a veteran when the person responsible for the company's military leave policies testified that she understood that USERRA requires prompt reemployment, but the defendant failed to respond to the plaintiff's requests for reemployment for months.  *Id.* at 191. The *Serricchio* Court also affirmed the district court's holding below that to demonstrate reasonableness, a company must demonstrate that it at least attempted to comply with the law, even if it may have had a reasonable misunderstanding of the law. *Id.* at 192.

AA cannot show that it acted reasonably or in good faith or that its actions were not willful.  AA's own military leave policy purports to support "all our employees who serve our country as members of the Uniformed Services, including members of the Reserves and National Guard."  SMF ¶ 3.  This policy promises to provide benefits to veterans pursuant to USERRA. *Id.*  One of AA's 30(b)(6) designees, Scott Hansen, testified that AA understands that an employee returning from military leave must be "promptly reemployed," which in most circumstances must be immediate.  SMF ¶ 8.  Yet, Hansen admits that AA interprets that being reinstated "subject to USERRA rights" means a person may be reinstated only so long as the person is qualified for the position.  SMF ¶ 9.  Hansen is unsure of the source of this rule within USERRA, but he testified that such a policy has "long been his understanding" of USERRA.  *Id.* And Hansen testified that although he could not point to specific language that required a returning veteran to prove qualification prior to reemployment, Hansen "knows it's there."  *Id.*  It

is undisputed that Hansen is responsible for decisions made regarding pilots at AA returning from military leave, and holds to the policy that a pilot must be "qualified" before being reemployed. SMF ¶ 13. This is unreasonable since "qualified" appears nowhere in § 4312.

Kalosa testified that AA operates under a policy that requires a veteran returning to a pilot position to have a valid medical to be either a pilot or to train. SMF ¶ 11. Kalosa testified that this was an FAA requirement "as best as [she] knows," but Kalosa admitted she "doesn't know that [she] could point to a particular person or source" for this rule. *Id*. And AA's training department requires pilots to have a first class medical certificate to train even in a simulator because without such a certificate, AA otherwise deems such persons unqualified. SMF ¶ 12.

Shaw admits that he told Harwood that AA would not reemploy Harwood for training unless and until Harwood had a first class medical certificate because, according to Shaw, "that's kind of been the rule of thumb for the last 17 years that [he has] been with [AA]." SMF ¶ 31. Hansen and Kalosa both admit that Harwood met the four qualifications of § 4312 of USERRA and further admit that AA refused to reemploy Harwood on September 1, 2015 or soon thereafter because AA deemed him unqualified under the company's manifestly incorrect understanding of USERRA. SMF ¶¶ 42-46. And the willfulness of AA's actions are only further demonstrated by the fact that once Harwood had a first class medical certificate (and with nothing more), AA reemployed Harwood because Hansen suddenly deemed Harwood "qualified." SMF ¶ 61.

In his correspondence with Scott Hansen in September 2015, Harwood himself informed Hansen that Harwood believed AA's policy of requiring Harwood to have a first class medical to be "qualified" so that Harwood could be reemployed violated USERRA. SMF ¶ 40. And in this email, Harwood asked for clarification. *Id*. Hansen responded to Harwood and admitted that Harwood did, in fact, meet the reemployment requirements of Section 4312. But Hansen

nonetheless insisted that Harwood could not be reemployed because he deemed Harwood unqualified under Section 4313 of USERRA. *Id.*

Hansen further skipped over most of the language of 4313 as well, intentionally omitting "after reasonable efforts" from the process and refusing to find and disclose all equivalent positions, instead finding work that AA desperately needed done, without regard for the processes and protections discussed above, in an obvious attempt to supersede, nullify, and diminish the rights and benefits that would "cost them money." And, perversely, both Hansen and Shaw admit that if Harwood had only been an active pilot, instead of a veteran attempting to gain reemployment, Harwood would have had full access to all benefits. SMF ¶ 35.

On these facts, it is undisputed that AA's actions were not reasonable, were not made in good faith, and were willful. As in *Serricchio*, the very person responsible for administering military leave, Scott Hansen, admits that USERRA requires prompt reemployment. *Serricchio*, 658 F.3d at 191. Although AA did respond to Harwood's requests, AA insisted at every step that it would require Harwood to be deemed "qualified" by way of a first class medical certificate before it reemployed him. AA, through Hansen, continued this line of insistence even in the face of being advised that the conduct might violate USERRA by Harwood himself. The "policy" or "practice" on which AA's witnesses purport to rely is, according to Hansen and Kalosa, based in USERRA. But neither witness could identify the where or what in USERRA supports such a policy. And as detailed at length in Section II, *supra*, such a "policy" facially violates USERRA. There is no dispute that Hansen, Kalosa, and Shaw all admit that AA refused to reemploy Harwood in September 2015 precisely because they did not deem him "qualified" to be reemployed. Such admissions are the very definition of willful behavior, in that they are deliberate and showed reckless, self-serving disregard for the obligations imposed under

USERRA. *Davis*, 961 F. Supp. 2d at 735 (quoting 20 C.F.R. § 1002.312(c)). There is likewise no dispute that AA employs 15,000 pilots and that at any given time, 200 to 300 of these pilots are on military leave. SMF ¶¶ 1-2. Any contention that a corporation of this size with so many pilots utilizing military leave, and a virtual army of HR professionals and lawyers, could reasonably or in good faith interpret USERRA to allow the corporation to consider qualifications before reemployment begs credulity. For all these reasons, AA cannot succeed in showing that its actions were reasonable, made in good faith, or were non-willful.

<u>Conclusion</u>

The undisputed facts show, and as a matter of law, AA violated Harwood's reemployment rights under Section 4312 of USERRA by unilaterally declaring Harwood was "unqualified" **prior to** reemployment, and **refusing** any effort until January 26, 2016 to assist him to become qualified for the position to which he was entitled by law. The facts also demonstrate that AA violated Section 4313, both by virtue of its blatant violation of Section 4312 and the alternative position offered to Harwood, even if it had been made after reemployment, and after exhausting all efforts to qualify Harwood for his escalator position, clearly violated Harwood's right to a position with an equivalent status. Finally, the undisputed facts of this case show that AA took the actions it did willfully, unreasonably, and not in good faith. This Court should grant Harwood's motion for summary judgment on Counts II and III of Harwood's Complaint and on AA's Affirmative Defenses Three and Eight and enter judgment in Harwood's favor. Any trial of this matter would only then need to be a damages hearing if the parties could not reach any stipulations as to damages.

Respectfully submitted,

_____
/s/

30

Adam Augustine Carter
R. Scott Oswald
The Employment Law Group, P.C.
888 17th St. NW, 9th floor
Washington, D.C. 20006
(202) 261-2803
(202) 261-2835(facsimile)
acarter@employmentlawgroup.com
soswald@employmentlawgroup.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2018, the foregoing was served via ECF on the

following:

Matthew F. Nieman, Esq.
Conrad S. Kee, Esq.
JACKSON LEWIS P.C.
10701 Parkridge Boulevard
Suite 300
Reston, VA 20191
Tel: (703) 483-8300
Fax: (703) 483-8301
niemanm@jacksonlewis.com
KEEC@JacksonLewis.com
*Counsel for Defendant*

/s/ Adam Augustine Carter
Adam Augustine Carter, VSB #32722
R. Scott Oswald
The Employment Law Group, P.C.
888 17th St. NW, 9th floor
Washington, D.C. 20006
(202) 261-2803
(202) 261-2835(facsimile)
acarter@employmentlawgroup.com
soswald@employmentlawgroup.com
*Counsel for Plaintiff*